CASIANO ET AL., DEMANDANTES Y APELADOS, *v.* LUCHETTI, DEMANDADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Ponce en causa sobre filiación y complemento de legítima.

No. 1412.—Resuelto en junio 19, 1916.

HIJOS NATURALES—RECONOCIMIENTO—TESTAMENTO OLÓGRAFO—AUTO AUTÉNTICO—CÓDIGO CIVIL FRANCÉS.—El Código Civil francés no considera el testamento ológrafo como un acto solemne y auténtico por el cual el padre expresa su intención de dar a su hijo un estado, pero exige la comparecencia del padre ante algún funcionario público y la ejecución del acto cuando el hijo no ha sido reconocido al tiempo de su nacimiento.

CÓDIGOS EXTRANJEROS—PRUEBAS.—Cuando se trata de códigos extranjeros, para que puedan ser considerados en juicio es necesario que sean ofrecidos como prueba, de conformidad con la Ley de Evidencia.

HIJOS NATURALES—ACTO AUTÉNTICO—TESTAMENTO OLÓGRAFO—PROTOCOLIZACIÓN—LOCUS REGIT ACTUM—CÓDIGO CIVIL FRANCÉS.—Un acto que no es auténtico

bajo las leyes de un país extranjero, no puede llegar a serlo de acuerdo con el principio *locus regit actum* porque sea llevado al protocolo de un notario en Puerto Rico, por alguna otra persona, y como en Francia el testamento sólo necesita ser publicado por el juez del lugar en que se otorga, su protocolización en Puerto Rico no produce efecto de autenticidad.

Id.—Residencia Temporal—Ciudadanos—Locus Regit Actum—Código Civil Francés—Testamento Ológrafo—Prueba del Testamento—Defecto de Forma.—El Código Civil francés tiene en cuenta el derecho de sus ciudadanos que residen temporalmente en otros países donde es innecesaria la intervención del funcionario público en el otorgamiento de un testamento para que sea válido según las formalidades de dichos países, pero a menos que el testamento esté hecho en país extranjero el principio *locus regit actum* no tiene aplicación, y la protocolización de un testamento no hace de él un documento auténtico.

Id.—Legitimación—Reconocimiento—Derecho Internacional Privado.—Es un principio muy conocido de derecho internacional privado que el hijo que ha sido legitimado en el país de su padre será considerado como legítimo en cualquiera otra parte, y si un hijo natural reconocido se legitima en esta forma en determinado país, recibirá el debido reconocimiento en otra jurisdicción.

Id.—Filiación—Testamento Ológrafo—Acto Voluntario—Nacionalidad.—En una acción de filiación en que por virtud del testamento ológrafo se quiere conferir un *status* al hijo natural, aun cuando ese acto del padre haya sido voluntario, debe regirse por la ley de su país que se presume conocía.

Id.—Reconocimiento—Testamento Ológrafo—Orden Público—Nacionalidad.—Si un francés domiciliado en Francia otorga un testamento ológrafo reconociendo a los hijos que tuvo mientras residía temporalmente en Puerto Rico, no existe cuestión alguna de orden público. La legislatura española adoptó la ley de nacionalidad en cuestiones de familia para sus propios súbditos, y no hay razón alguna de orden público para someter a un francés, aunque esté domiciliado en Puerto Rico, a ninguna ley que no sea la de su propio país.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. A. F. Castro.*

Abogados del apelado: *Sres. José y Manuel Tous Soto.*

El Juez Asociado Sr. Wolf emitió la opinión del tribunal.

Don Tristán Luchetti falleció en París, Francia, el día 12 de febrero de 1897, siendo ciudadano francés, vecino de Yauco, Puerto Rico. Era soltero y no dejó descendientes ni ascendientes legítimos. En agosto 20, 1896, y, por tanto, pocos meses antes de su muerte, otorgó un testamento ológrafo en el que instituyó por su único y universal heredero a su hermano Mateo Luchetti con la siguiente cláusula especial:

"Dejo los $14,000 pesos (plata provincial) de por mitad, a mi hijo natural, nacido el primero de abril de 1895, que he tenido en

mi concubina Justa, que tú conoces, y a otro niño por nacer de la misma, que he dejado en cinta; este dinero no les será entregado, ($7,000 a cada niño, con la obligación para ellos de entregar de los mismos a su madre $1,000 cada año), hasta la edad de diez y ocho años cumplidos. Mientras tanto, emplearás el interés al 5 por ciento anual en proveer a sus necesidades y a la subsistencia de la madre, así como en hacerles dar una instrucción elemental bastante esmerada, para que puedan, cuando sean hombres, hacer buen uso de su pequeño capital. Tenles también cariño y atenciones en memoria mía. Si alguno de los dos llegase a fallecer antes de la edad de diez y ocho años, su parte irá mitad al sobreviviente, mitad para tí; si muriesen los dos, todo te correspondería a tí, salvo la suma de dos mil pesos ($2,000) que quedaría siempre adjudicada a la madre.''

El testamento fué en forma de carta testamentaria dirigida a su referido hermano y en ella hizo el testador otros legados. Al morir Don Tristán, su hermano tomó el testamento e hizo que fuera formalmente protocolado en la oficina del Notario Matienzo Cintrón. En febrero 17, 1915, dicho Mateo Luchetti satisfizo a los referidos hijos mencionados en el testamento y legalmente emancipados por la Corte de Distrito de Ponce, el importe correspondiente a sus legados, o sea 7,000 *pesos* a cada uno; y dichos hijos emancipados aceptaron el mismo y subsiguientemente, en febrero 24, 1915, establecieron la presente acción.

El derecho a la filiación reclamado en este pleito se hace depender principalmente de la cláusula del testamento que ha sido transcrita. Como consecuencia de su pretendido derecho a ser los hijos naturales reconocidos de Don Tristán, alegan también su derecho a recibir la diferencia entre lo que constituiría su porción especial como herederos forzosos y la suma que en realidad les ha sido satisfecha. Parece haberse admitido que el importe de dicha porción legítima tendría que ser determinado por la ley de Francia y también parece ser un hecho que la cantidad que realmente recibieron como legados prácticamente hubiera cubierto sus porciones legítimas si dichas porciones tuvieran que determinarse por la ley de Puerto Rico; en otras palabras, el montante de la

herencia de Don Tristán era de 42,888.50 *pesos,* y los hijos
naturales reconocidos de acuerdo con el código entonces en
vigor, hubieran tenido derecho a una tercera parte de la
misma.   Según la ley de Francia, viviendo un hermano, dichos
hijos naturales hubieran tenido derecho a las tres cuartas
partes, de la suma que los hijos legítimos hubieran recibido,
a sea, tres cuartas partes de dos tercios; o una mitad.   La
diferencia entre los legados y la suma reclamada es aproxi-
madamente de 7,000 *pesos provinciales,* con sus intereses.

Hubo pruebas de peritos y citas de la ley de Francia sufi-
cientes para demostrar que en Francia un testamento oló-
grafo como éste no daría a un hijo natural que vive en Fran-
cia la condición (*status*) de un hijo natural reconocido.   La
ley de Francia no considera al testamento ológrafo como un
acto solemne y auténtico por el cual el padre expresa su in-
tención de dar a su hijo un estado.   Esa ley exige la compa-
recencia del padre ante algún funcionario público cuando el
hijo no ha sido reconocido al tiempo de su nacimiento.   La
autenticidad es la regla en Francia.

Los apelados admiten en sustancia, que el testamento oló-
grafo por sí no serviría en Francia, pero insisten grande-
mente en el hecho de su protocolización en Puerto Rico.

El artículo 1317 del Código Civil Francés es como sigue:

*"L' acte authentique est celui qui a été recu par officiers publics
ayant le droit d'instrumenter dans le lieu au l'acte a été rédigé, et
avec les solemnités requises."*

"El acto auténtico es aquel que ha sido autorizado por funcio-
nario público que tenga el derecho de actuar en el lugar en que el
acto haya sido redactado, y con las solemnidades requeridas."

También presentan los apelados en su alegato el artículo
1322 del Código Civil Francés, el cual es como sigue:

*"L'acte sous seing privé, reconnu par celui auquel on l'oppose,
ou légalement tenu pour reconnu, a, entre ceux qui l'ont souscrit et
entre leurs héritiers et ayant-cause, la meme foi que l'acte authen-
tique."*

El juez de la corte inferior certificó que toda la prueba fué transcrita en la exposición del caso, pero no encontramos que el artículo 1322 fuera ofrecido como prueba, como es necesario tratándose de códigos extranjeros. Hemos examinado cuidadosamente los autos porque la cita no nos parecía muy clara como fué hecha en el alegato de los apelados, lo mismo en francés que en español. La versión española es como sigue:

"El documento privado reconocido por aquel a quien se opusiere o legalmente tenido por reconocido, tiene entre los que lo suscribieron y sus causahabientes el mismo efecto que el documento auténtico."

Ahora bien, estas palabras tal vez pueden significar que si la persona que reclama un derecho por virtud del documento reconoce la autenticidad del mismo, dicho documento será considerado como auténtico, pero podrían dar a entender otras varias cosas. Para mayor seguridad hemos examinado el Código Francés y nos inclinamos a creer que el artículo citado se refiere al efecto que producen los documentos privados entre las partes y que no fué la intención hacer a este artículo equivalente a un acto auténtico. La corte inferior no se basó al parecer en este artículo, ni tampoco los apelados, si es que los entendemos, sostienen que el acto del demandado al protocolar el testamento era el acto auténtico, o su equivalente, a que se refiere el artículo 1322. Existe, sin embargo, una decisión de la Corte de Apelaciones de París que más adelante se menciona específicamente, que ha sido copiada en los autos, (página 47 y siguientes), que niega la autenticidad de un testamento ológrafo de acuerdo con el cual reclamaban los demandantes en una acción, y, por tanto, llegamos a la conclusión de que aun cuando el artículo 1322 se encontrara debidamente sometido a la consideración de este tribunal no produce el efecto de sustituir un testamento ológrafo por el acto auténtico a que se refiere el artículo 1317.

Los apelados sostenían que la protocolización en Puerto

Rico del testamento de una persona domiciliada en Puerto Rico lo convertiría en un acto ejecutado ante un funcionario público y que de acuerdo con el principio de *"locus regit actum"* como el domicilio del fallecido y los bienes todos iban a surtir efecto en Puerto Rico las reglas locales deben ser aplicables. Pero no podemos ver cómo un acto que no es auténtico bajo las leyes de determinado país y que requiere la comparecencia de una persona ante un funcionario público puede llegar a ser auténtico porque el acto particular o documento sea llevado al protocolo de un notario por alguna otra persona. Como Don Tristán era francés y en Francia un testamento ológrafo sólo necesita ser publicado por el juez del lugar en que se otorga, dudamos de si la protocolización ante el notario en Puerto Rico no era superflua. La resolución de la corte francesa a que nos hemos referido declaraba que el reconocimiento en un testamento ológrafo no surtiría efecto bajo la ley francesa y no podría servir como un testamento inglés y acto público por no haber sido debidamente autenticado. Tomado de Dalloz, Compilación Periódica y Crítica de la Jurisprudencia, etc., 1897, parte segunda, página 339. En otras palabras, jamás podía ser presentado para probar su autenticidad en las cortes inglesas como testamento válido, por lo que no estaba comprendido dentro de las prescripciones del artículo 999 del Código Civil Francés, que permite a un francés otorgar un testamento válido de acuerdo con las formalidades de un territorio extranjero. El testamento era nulo *ab initio* como testamento bajo la ley inglesa, pero válido como ológrafo según la ley francesa; en otras palabras, de conformidad con el principio de *locus regit actum* la corte francesa hubiera dado validez al reconocimiento del testador de haber observado éste la forma para un testamento válido bajo la ley inglesa. En el presente caso el testamento fué otorgado en Francia y el único *"locus"* aplicable era París. Si el testador hubiera otorgado un testamento ológrafo en Puerto Rico con las formalidades requeridas aquí para el mismo, una cuestión diferente podría presentarse, pero aun

así pudiéramos dudar.   Lo que tiene en cuenta la ley francesa es el derecho de sus ciudadanos si están temporalmente en Inglaterra o en los Estados Unidos, o en otros países, donde es innecesaria la intervención de un funcionario público en el otorgamiento de un testamento, para hacer una cosa equivalente en dichos países.   El requisito de la ley inglesa en estos casos es muy formal.   Los testigos deben haberse presentado a petición del testador; deben verlo firmar; dar fe de su firma y firmar en presencia del testador y de cada uno de los demás.   Todo esto aparece de la opinión francesa que ha sido copiada en los autos.   Los apelados están en un error en creer que la cuestión de la prueba de la autenticidad del testamento es la parte importante que ha de ser considerada respecto a la cuestión de un testamento inglés válido. Aun cuando hubiera sido aceptado por la corte el testamento, jamás hubiera sido un testamento válido si los testigos meramente firmaron sin cumplir con los demás requisitos que hemos indicado.   Los defectos no eran meramente formales; ellos impiden que el supuesto último acto de un hombre pueda convertirse en un testamento válido.   Pasquale Fiore en su obra sobre Derecho Internacional Privado, Madrid, Edición 1889, Tomo III, párrafo 744, trata de la cuestión de hasta qué punto las cortes francesas darán validez a un acto ejecutado en territorio extranjero, como sigue:

"Solamente podemos conceder que si a consecuencia de la acción judicial promovida ante el tribunal extranjero donde el hijo haya nacido y donde con la posesión de estado adquirió la condición civil de hijo natural de una persona determinada, se hubiese establecido judicialmente dicha condición, esta sentencia podría servir para establecer el estado de filiación natural aun en la patria del padre, donde no se reputase eficaz para este objeto la posesión de estado. La razón en que esto se funda es la de que, según la ley italiana, por ejemplo, y lo mismo sucede con la francesa, la autenticidad es un requisito indispensable para la eficacia del reconocimiento, pero no se requiere que el acto se realice con el fin principal de hacer constar la paternidad y la filiación, y de aquí que se considere válido

el reconocimiento hecho accidentalmente en un acta auténtica con expresiones simplemente enunciativas pero no equívocas, y que se considere también tal la concesión judicial comprobada por el magistrado.

"Ahora bien: así como la sentencia extranjera tiene el carácter de la autenticidad, así también cuando mediante ella se hubiese hecho constar la filiación paterna por la posesión de estado y éste se hubiese reconocido en juicio contradictorio con el padre, equivaldría a una confesión judicial explícita por parte de éste, y bastaría para atribuir al reconocimiento el carácter de la autenticidad que nuestra ley exige."

Y en el párrafo anterior presenta como opinión suya que la regla *locus regit actum* sería invocada en vano para dar al hijo un *status* válido que no le ha sido conferido por la ley del domicilio del padre.

La verdadera e importante cuestión en este caso es si es la ley francesa, o la de Puerto Rico vigente en 1897 la que debe regir. Tristán Luchetti era un ciudadano francés domiciliado o con residencia en Puerto Rico. Los hijos vivían en Puerto Rico y hasta el otorgamiento del testamento, por lo menos, eran súbditos españoles. La ley francesa y la española están en conflicto. Como ha indicado Fiore, *supra*. artículo 723, no puede haber relación establecida para el hijo que no establece la relación recíproca con el padre. ¿A qué ley ha de dársele efecto?

El testador falleció en 1897 y todos los actos del padre relativos a la protocolización y demás, fueron ejecutados antes de tener lugar el cambio de la Soberanía de España a la de los Estados Unidos; por tanto, creemos por esta sola razón que las decisiones de este tribunal en los casos de *Marimón* v. *Pelegrí,* 2 S. P. R. 331, y *Cruz* v. *Domínguez,* 8 D. P. R. 580, no son de aplicación; pero también convenimos con el apelante en que las decisiones de este tribunal en materia de divorcio, en los cuales fué desplegado un sistema especial por nuestra corte no tienen aplicación a un principio general de derecho internacional privado.

Los artículos 9, 10 y 11 del Código Civil Español, entonces vigente, son los siguientes:

"9. Las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal de las personas, obligan a los españoles, aunque residan en país extranjero.

"10. Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles a las leyes del país en que están sitos.

"Sin embargo, las sucesiones legítimas y las testamentarias, así respecto al orden de suceder como a la cuantía de los derechos sucesorios y a la validez intrínseca de sus disposiciones, se regularán por la ley nacional de la persona de cuya sucesión se trate, cualesquiera que sean la naturaleza de los bienes y el país en que se encuentren.

"Los vizcaínos, aunque residan en villas, seguirán sometidos, en cuanto a los bienes que posean en la tierra llana, a la ley 15, título 20 del Fuero de Vizcaya.

"11. Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen.

"Cuando los actos referidos sean autorizados por funcionarios diplomáticos o consulares de España en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes españolas.

"No obstante lo dispuesto en este artículo y en el anterior, las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por disposiciones o convenciones acordadas en país extranjero."

Las cortes del Continente Europeo por razón de los preceptos del artículo 9, movidas por un principio de cortesía o reciprocidad, siempre han aplicado a un extranjero las leyes de su propio país. En el caso de *Colón* v. *El Registrador de Aguadilla,* 22 D. P. R. 369, esta corte trata con insistencia de este principio de reciprocidad. Creemos que ese caso, en el que también se fundan los apelados, tiene una tendencia general en su contra. Fué una de las excepciones que tienden a probar lo que es la regla. En dicho caso

dijimos que en cuestiones que afectan a los bienes inmuebles seguiremos los principios del derecho internacional privado que han sido establecidos en los Estados Unidos. Pero esa decisión no va más lejos y en verdad que en ella se indica que si no hubiera sido por el cambio hecho a instancia de la Comisión Codificadora, nuestras cortes pudieran haber quedado obligadas a seguir las prescripciones del Código Civil Español.

Por otra parte no creemos que la decisión de la Corte Suprema de París proporcionaría ninguna luz sobre la cuestión principal en este caso, porque en este caso francés no existía cuestión alguna entre dos jurisdicciones en que por la ley de una un hijo quedaba convertido en hijo natural reconocido y por la ley de otra no. Ni por la ley de Inglaterra ni por la de Francia los hijos mencionados en dicho testamento hubieran recibido un nuevo *status*.

Es sin embargo, un principio muy conocido de derecho internacional privado, que un hijo que ha sido legitimado en el país de su padre será considerado como legítimo en cualquier otra parte; y si un hijo natural reconocido se legitima en esta forma en determinado país, recibirá el debido reconocimiento en otra jurisdicción, y se verá después que la legitimación de que se habla comprende los reconocimientos.

Ninguna de las partes en este caso ha citado ninguna de las decisiones de las cortes americanas. Sin embargo, estas cuestiones de derecho internacional privado están surgiendo constantemente en los Estados Unidos. Desde hace mucho tiempo en la jurisprudencia de los Estados Unidos se hizo necesario el decir que la ley del domicilio debía determinar el *status* u obligación personal, según sea el caso. Pero la cuestión del *status* de un hijo depende del ejercicio de la voluntad de su padre en Francia y generalmente es así en los Estados Unidos. Por lo general está prohibida la investigación de la paternidad de un hijo. Ahora bien, en tanto un acto es voluntario, creemos que las autoridades son perfectamente claras al decir que la interpretación que ha de

darse a determinado acto o documento debe regirse por la ley del país del padre o domicilio según sea el caso. En los Estados Unidos el principio relativo al domicilio ha sido sustituído por el de nacionalidad; pero teniendo presente esta diferencia son aplicables los precedentes de las cortes americanas. A veces existen en varios Estados de los Estados Unidos mayores diferencias respecto a cuestiones de familia que las que existen entre Francia y España. La cuestion de si un hombre es ciudadano de determinado Estado es principalmente una de domicilio y, por tanto, las leyes de los varios Estados producen un conflicto semejante a éste que el que existe entre ciudadanos de varios países, Por ejemplo, *Blythe* v. *Ayres,* 96 Cal. 532, 19 A. R. 40, fué un caso en que el padre era un ciudadano de California; el hijo y su madre se encontraban viviendo en Inglaterra. Bajo la ley de California los actos de un padre al reconocer a su hijo y recibirlo en su familia constituye un reconocimiento. Se supone que el hijo adquiere el *status* inmediatamente. La corte resolvió que la ley de California era aplicable. Por el contrario en el caso de *Irving* v. *Ford,* 65 L. R. A. 177, el padre del niño estaba domiciliado en Massachusetts, habiendo estado domiciliado originalmente en Virginia donde tanto el padre como la madre del niño eran esclavos. En Virginia se aprobó una ley declarando legítimos a los hijos de dichos matrimonios esclavos, pero entonces el padre del niño estaba domiciliado en Massachusetts. La Corte de Massachusetts resolvió que una ley de Massachusetts no solamente exigía el matrimonio de los padres, sino el reconocimiento expreso y, por tanto, que el hijo jamás había quedado convertido en legítimo. En este caso la corte de Massachusetts cita el de *Blythe* v. *Ayres, supra.* La corte habla, entre otras cosas, de la legitimación de un niño, en otras palabras, el uso de la palabra "legitimación" es aplicable lo mismo a los reconocimientos o a cualquier cosa por la que se confiere un *status* al hijo. En lo que respecta a estas cuestiones de *status* la regla generalmente aplicada es la de

que la ley del domicilio del padre debe prevalecer. Fiore, *supra,* párrafo 720 y siguiente; 5 Ruling Case Law, 920; *Blythe* v. *Ayres,* 96 Cal. 532, 11 L. R. A. 40; *Irving* v. *Ford,* 65 L. R. A. 177.

No tendríamos duda alguna en este caso si en este pleito se diera por sentado meramente que el testamento ológrafo del padre confería por sí un *status* a los demandantes en esta acción; entonces sería perfectamente claro para nosotros que en tanto el conferir un *status* se hacía depender del acto voluntario del padre, que dicho acto voluntario debe ser determinado por la ley del país a que él pertenecía y las leyes que es de presumirse que conoce. Pero una cuestión algo diferente se presenta bajo una ley que confiere al hijo el derecho de obligar al padre a que lo reconozca. El artículo 135 del Código Civil Español, vigente en Puerto Rico en 1897, disponía:

"El padre está obligado a reconocer al hijo natural en los casos siguientes:

"1°. Cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad.

"2°. Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos directos del mismo padre o de su familia.

"En los casos de violación, estupro o rapto, se estará a lo dispuesto en el Código Penal en cuanto al reconocimiento de la prole."

En otras palabras, el Código Civil Español, aplicable a los hechos de este caso, si de algún modo lo es, reconocía el derecho de un hijo para obligar a su padre natural a reconocerle bajo ciertas condiciones. Estas condiciones pueden ser probadas para demostrar la paternidad del hijo, aunque en Francia está prohibida toda investigación sobre la paternidad a falta de un reconocimiento auténtico del padre. El juez de la corte inferior basó su decisión en gran parte en el hecho de que debe regir la ley de Puerto Rico por razones de orden público, como expresa el artículo 11 del Código Civil; y hace alguna insistencia en los casos de *Marimón* v. *Pelegrí*

y *Cruz* v. *Domínguez, supra.* Haciendo notar más la diferencia de estos casos podemos decir que ningún derecho de un extranjero excepto el de un español estaba envuelto, y también que la institución del divorcio absoluto es una cuestión que la misma ley ha regulado como cuestión de domicilio.

Al tratar, pues, de llegar al punto de si el reconocimiento de un hijo natural es una cuestión de orden público, creemos que debemos empezar de nuevo. Como indica el apelante, es la tendencia del gobierno (*public policy*) de algunos sitios permitir el reconocimiento de hijos naturales, mientras que en otras partes no se permite en absoluto. La tendencia más general en los Estados Unidos es no conferir a los hijos naturales derechos de ninguna clase en contra de sus padres. Solamente algunos Estados lo han hecho así. Cuando ha habido un conflicto de leyes en la materia de legitimación generalmente ha sido debido al subsiguiente matrimonio de los padres. No solamente tenemos que considerar en cuanto a la cuestión de orden público los derechos de los hijos naturales reconocidos en lo que respecta a los sitios donde se legitiman los hijos de este modo, sino también de los lugares que no permiten tal legitimación. Por ejemplo, si un inglés está domiciliado en Puerto Rico, ¿podría ser obligado a reconocer a un hijo natural cuando, por su propia ley, no es posible tal legitimación? Un número de portorriqueños está actualmente domiciliados en los Estados Unidos y jamás han adquirido ciudadanía. Si tal portorriqueño hiciera un reconocimiento público de un hijo natural que tuvo mientras se encontraba accidentalmente en Puerto Rico, ¿tendría que regirse por la ley de Puerto Rico o por la del sitio en que estaba domiciliado? El artículo 9 del Código Civil determina claramente que dicha persona ha de regirse por la ley de Puerto Rico. De acuerdo con las decisiones parecería probable que si una persona domiciliada en New York reconociera a un hijo domiciliado en California, los herederos de la persona de New York podrían impugnar válidamente dicho reconocimiento. Como dijimos en el caso de Colón, debemos

regirnos en parte por la actitud que las cortes que revisan
nuestras decisiones considerarían la cuestión en discusión.
Según antes se ha indicado, creemos que las cortes de los
Estados Unidos, como lo han hecho antes, sustituirían por
la cuestión de domicilio en el caso de un ciudadano nativo
de los Estados Unidos, la de nacionalidad en el caso de un
súbdito extranjero. Sabemos, por supuesto, que la jurispru-
dencia de los Estados Unidos en la que se dice que no puede
imponerse ningún *status* al padre *in invitum* no puede tener
aplicación al artículo 135 del Código Civil Español que se
gún sus términos expresa que el padre "puede ser obligado."
Alegan los apelados que este precepto del Código Civil Es-
pañol es una especie de penalidad y que ningún hombre puede
quedar domiciliado en Territorio de Puerto Rico y tratar de
eludir su responsabilidad por los actos especificados en ese
artículo.

Los actos por los cuales un padre puede ser obligado a
reconocer a un hijo no se diferencian mucho en su clase de
los actos por los cuales se crea inmediatamente un *status* de
acuerdo con el artículo 131 y siguientes del Código Civil Es-
pañol. Todos ellos conducen a la creación de un nuevo *status*
con los derechos consiguientes de sucesión o de herencia for-
zosa. Parece que si la legislatura hubiera deseado poner
algo a manera de una penalidad a los extranjeros domici-
liados en su territorio se hubiera expresado de un modo
más específico. Por el contrario, el verdadero significado del
artículo 9 se funda en el principio de reciprocidad de que el
extranjero domiciliado en Puerto Rico, debe, sin embargo,
regirse por la ley de su nación. Si hemos de juzgar por las
consecuencias generales y necesarias de un reconocimiento
éstas generalmente envuelven derechos de propiedad; en otras
palabras, el efecto de la sentencia de una corte al declarar
a un niño hijo natural reconocido, es hacerlo heredero de su
padre. ¿No están envueltos fundamentalmente otros dere-
chos que no sea la cuestión de los derechos de sucesión y he-
rencia? Es verdad que el derecho a reclamar alimentos en

vida de un padre está también envuelto, pero parece sumamente dudoso que esta expresión del Código Civil deba ser interpretada como una reglamentación *quasi* de policía, (*quasi-police regulation*).

Si un ciudadano francés domiliciado en Puerto Rico reconoce públicamente a un hijo, o ejecuta cualquiera de los actos mencionados en el artículo 135, si ese hijo obtiene una sentencia contra su padre, queda convertido *ipso facto* en ciudadano francés. Esta es también una consideración que hacemos para determinar si el legislador en el artículo 135 quiso establecer un precepto de orden público.

Si se examinan los artículos 9, 10 y 11 del Código Civil Español, se verá que el artículo 11, al referirse al orden público, solamente se refiere a dicho artículo y al anterior. En otras palabras, no se hace referencia específica al artículo 9. Es el artículo 9 el que determina los derechos de familia. El artículo 13 del Código Civil de Puerto Rico dice que cuando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu.

Como este supuesto derecho a obligar a un padre a reconocer a su hijo natural es claramente un medio de adquirir un *status*, no vemos razón alguna para distinguirlo de los demás medios cuando se trata de la cuestión de cuál es la ley que debe aplicarse. Si, por ejemplo, Don Tristán hubiera estado realmente domiciliado en Francia y hecho su testamento ológrafo reconociendo a dos hijos que tuvo mientras residía temporalmente en Puerto Rico, no podría haber discusión alguna de orden público.

En vista del hecho de que la legislatura española ha adoptado la ley de la nacionalidad en cuestiones de familia para sus propios súbditos, no vemos razón alguna de orden público para someter a un francés aunque tal vez esté domiciliado en Puerto Rico a ninguna ley que no sea la de su propio país.

Debe revocarse la sentencia, declarándose sin lugar la demanda, sin especial condenación de costas.

> *Revocada la sentencia apelada y declarada sin lugar la demanda sin especial condenación de costas.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Aldrey y Hutchison.

El Juez Asociado Sr. del Toro disintió.